IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **ROADGET BUSINESS PTE. LTD.**, a private limited company organized in the country of Singapore,<br><br>Plaintiff,<br><br>v.<br><br>**THE INDIVIDUALS, CORPORATIONS, LIMITED LIABILITY COMPANIES, PARTNERSHIPS, AND UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE A HERETO**<br><br>Defendants. | **CIVIL ACTION NO. 1:24-cv-1174** |

**MOTION FOR LEAVE TO**
**FILE AN AMICUS CURIAE BRIEF**

1

This motion for leave to file an *amicus curiae* brief is submitted by William W. Flachsbart of the law firm Dunlap, Bennett & Ludwig (the "Firm"). The Firm currently represents dozens of merchants who sell products on the Temu.com e-commerce marketplace and are being sued in a series of "Schedule A" lawsuits filed by Plaintiff Roadget Business PTE. LTD. ("Plaintiff"). To date, Plaintiff has filed five nearly identical suits against dozens of Temu merchants, some involving the same copyrights and the same Temu merchant defendants:

1. *Roadget Business PTE. LTD. v. Individuals et al. on Schedule A*, No. 23-cv-16262 (N.D. Ill. Nov. 27, 2023) (**29 Temu merchants, 1 copyright**).

2. *Roadget Business PTE. LTD. v. Individuals et al. on Schedule A*, No. 23-cv-17036 (N.D. Ill. Dec. 22, 2023) (**26 Temu merchants, 6 copyrights**).

3. *Roadget Business PTE. LTD. v. Individuals et al. on Schedule A*, No. 24-cv-115 (N.D. Ill. Jan. 4, 2024) (**17 Temu merchants, 10 copyrights**).

4. *Roadget Business PTE. LTD. v. Individuals et al. on Schedule A*, No. 24-cv-607 (N.D. Ill. Jan. 23, 2024) (**unknown Temu merchants, 9 copyrights**).

5. *Roadget Business PTE. LTD. v. Individuals et al. on Schedule A*, No. 24-cv-1174 (N.D. Ill. Feb. 9, 2024) (**unknown Temu merchants, 16 copyrights**).

The Firm represents roughly 40 of the Temu merchants across Plaintiff's first, second, and third-filed actions, and the Firm expects that it will likely come to represent Temu merchants sued in Plaintiff fourth-filed action and the instant fifth-filed action, to the extent it does not already.[1] Based on the Firm's interest, the Firm offers the below *amicus curiae* commentary, which the Firm believes will assist the Court with addressing material issues raised in Plaintiff's sealed *ex parte* TRO request in this action. *See Roadget Business PTE. LTD. v. Individuals et al. on Schedule A*, No. 24-cv-607, ECF No. 13 (N.D. Ill. Jan. 26, 2024) (granting the Firm's amicus brief in the fourth-

---

[1] Two of the Firm's client in the first-filed action were then sued in the second-filed action, resulting in a second TRO asset freeze on the exact same funds. *See* No. 23-cv-17036, ECF No. 24 at 7–8. It is therefore possible that the defendants in the fourth- and fifth-filed actions may already be Firm clients.

2

filed action); *Luckett v. Wintrust Fin. Corp.*, No. 22-cv-03968, 2023 U.S. Dist. LEXIS 121362, at *15 (N.D. Ill. July 14, 2023) ("Federal courts have discretion to permit amicus curiae briefs.").

**Plaintiff's first four Schedule A cases against Temu merchants**. The first three cases followed the same pattern: Each is a "Schedule A" complaint filed by Plaintiff for copyright infringement against dozens of merchants for selling products with allegedly copyrighted designs on the Temu platform. Plaintiff then immediately files a sealed *ex parte* TRO, which results in an indiscriminate freeze of the entire balance of the merchants' Temu accounts, consistently freezing funds exponentially higher than the meager profits derived from the accused products. In many cases the merchant did not sell any of the accused products or sold very little, yet the asset freezes have captured entire amount of the merchants' funds on deposit, often crippling their businesses.

For example, in one suit the amount frozen across the Firm's clients was nearly $1.9 million, while the profits from the accused products were approximately $37,000. In the other two suits, the amount frozen was nearly $900,000 and $250,000, respectively, while the profits were approximately $4,200 and $8,600, respectively. The majority of merchants only made $1,000 or less in profits from the accused products, yet the amount frozen is often exponentially more than the profits for almost every merchant. Most merchants have tens of thousands frozen, and some have hundreds of thousands frozen. And the frozen-asset count continues to rise each day because sales revenue from products not accused of infringement continues to flow into the accounts and are frozen immediately when the funds hit the accounts. Critically, however, by the time the merchant defendants are finally given notice of the suits and the TROs asset freeze (which at that time has already been enforced), the irreparable harm to their businesses from the asset freeze has already occurred, including the shuttering of legitimate business operations (involving thousands

3

of products not accused of infringement) and the mass termination of hundreds of highly skilled workers, resulting in incalculable harm to companies, their employees, and their families.

At a high level, here is the status of the first four cases:

1. **No. 23-cv-16262**: The TRO issued under seal; third party Temu froze all assets and produced the sales data for the accused products; and Plaintiff subsequently filed a motion for PI. This all occurred before the Temu merchants had a chance to retain the Firm and appear in the action. The Temu merchants have opposed the PI, and Plaintiff will file its reply brief this week. The Temu merchants have also filed a motion to dismiss for lack of personal jurisdiction, improper service, failure to state a claim, misjoinder, and other grounds.

2. **No. 23-cv-17036**: The TRO issued under seal; third party Temu froze all assets and produced the sales data for the accused products; and the Temu merchants subsequently engaged the Firm. The Temu merchants asked Plaintiff to reduce the asset freeze to the merchants' profits, or alternatively, to the sales revenue from the accused products. Plaintiff refused. After the merchants filed an emergency motion to dissolve or modify the TRO, and after two hearings with Judge Ellis, Plaintiff agreed to reduce the TRO asset freeze to the sales revenue from the accused products. Plaintiff has indicated it plans to file a motion for PI this week, which the Temu merchants will oppose. The Temu merchants also plan to file a motion to dismiss for lack of personal jurisdiction, improper service, misjoinder, and other grounds.

3. **No. 24-cv-115**: The TRO issued under seal; third party Temu froze all assets and produced the sales data for the accused products; and the Temu merchants subsequently engaged the Firm. The Temu merchants asked Plaintiff to reduce the asset freeze to the merchants' profits, or alternatively, to the sales revenue from the accused products. Plaintiff refused. The Temu merchants have filed an emergency motion to dissolve or modify the TRO. Plaintiff's opposition to the emergency motion is due this week. Plaintiff also filed a motion for PI, which the Temu merchants plan to oppose.[2]

4. **No. 24-cv-607**: The case remains sealed, and thus the Firm does not know the identity of the merchant defendants or the copyrights at issue. Plaintiff has filed a motion for TRO, which the Court has held in abeyance until Plaintiff responded to the Firm's amicus brief.

---

[2] The fourth-filed case, **No. 24-cv-607**, remains sealed. Plaintiff has filed a motion for TRO, which the Court has held in abeyance until Plaintiff responded to the Firm's amicus brief providing, which, similar to this brief, provided context to the court on the nature of the issues across these actions.

After spending weeks seeing this process play out across several different courts in this District, and given the lack of an opportunity to oppose Plaintiff's moving papers, the Firm offers the below insight that may help guide the Court on Plaintiff's motion for TRO.

**The Court should scrutinize Plaintiff's request for email service of process**. In Plaintiff's first three actions, Plaintiff asserted to the courts that email service is needed to accomplish service, implying that Plaintiff is unable to effect service by other means. As a result, and without any oppositional scrutiny, the three courts have excused Plaintiff from accomplishing service through the Hague Convention and allowed Plaintiff to effect service by email. However, the record Plaintiff creates (*ex parte* and under seal) is materially incomplete. In fact, nearly all Temu merchants provide their current business addresses in the very same URLs that Plaintiff pastes into Schedule A of the complaints. For example, clicking on the merchants' logo in the screenshot below provides the merchants' business address in a popup:



*See* https://www.temu.com/kamucc-m-31329578803.html.

Indeed, if Plaintiff then takes the additional minimal step of searching the same merchant's name on Temu's United Kingdom website (temu.com/uk), it reveals not only the merchant's

business address, but also the merchant's formal entity name (which, in the case of a company formed in China, as shown below, is the English translation of the company's name in Mandarin).



See https://www.temu.com/uk/kamucc-m-31329578803.html.

With this information in hand, Plaintiff can search the company's name on the Chinese government's registration database (https://www.gsxt.gov.cn/index.html) to locate even further corporate details on the company, as shown in the screenshot below depicting the results from searching the above Temu merchants' entity name in the Chinese government's database.



Thus, Plaintiff can verify for each Temu merchant it has sued whether it has easy access to their business addresses and other company information, but Plaintiff instead repeatedly has sought leave in every case and for every defendant to effect service by email. Importantly, while email service can, in appropriate circumstances, be authorized consistent with the Hague Convention and Fed. R. Civ. P. 4(f) "where the address of the [defendant] is not known," the plaintiff "must make reasonably diligent efforts to learn the defendant's mailing address." *Luxottica Grp. S.p.A. v. P'ships et al. on Schedule A*, 391 F. Supp. 3d 816, 822 (N.D. Ill. 2019). However, the plaintiff "cannot close its eyes to the obvious." *Id*. Here, it would appear Plaintiff has closed its eyes.

Indeed, for the first time across all five cases, in the instant case Plaintiff's declarant (Tim Wei) conceded that "some [defendants] may have address information available on their Temu online marketplace," ECF No. 10-1 at ¶ 6, but Plaintiff inexplicably still requests email service in violation of the Hague Convention and incorrectly claims all Temu merchants are "anonymous." *Id*. Plaintiff should, at the least, identify those merchants whose business addresses and other company information are available to Plaintiff so the record can reflect whether they reside in a Hague Convention signatory country, and thus whether there is still justification for avoiding ordinary service of process. Failing this diligence, Plaintiff would seem to be asking this Court to potentially order a result that may run afoul of the Hague Convention, resulting in inevitable dismissal of the suit for those defendants whose business addresses are readily available to Plaintiff. *See Luxottica*, 391 F. Supp. 3d at 823 (dismissing complaint after previously approving email service where it was shown that plaintiff had access to defendants' business addresses).

Moreover, the service-of-process case law Plaintiff asks this Court to rely on is misplaced. *See* ECF No. 10 at 13 (quoting *Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1017–18 (9th Cir. 2002)). For example, as Plaintiff asserts in its citation to *Rio Properties*, the Ninth Circuit allowed email service after finding that the defendant had "neither an office nor a door; it had only a computer terminal," *id*. which is distinguishable from the present circumstances in which the defendants' business addresses are available to Plaintiff, a fact that Plaintiff acknowledges. But more fundamentally, *Rio Properties* involved service in Costa Rica, which the is not a Hague Convention signatory, a threshold issue the Ninth Circuit confirmed before affirming the propriety of email service. *See* 284 F.3d at 1015 n.4 ("A federal court would be prohibited from issuing a Rule 4(f)(3) order in contravention of an international agreement, including the Hague Convention referenced in Rule 4(f)(1). The parties agree, however, that the Hague Convention does not apply

8

in this case because Costa Rica is not a signatory."). Plaintiff's failure to disclose the accessibility of the defendants' business addresses and formal entity names is obstructing the Court's ability to address this threshold issue.

**The Court should scrutinize Plaintiff's joinder of unaffiliated and independently operating merchants accused of infringing different copyrights**. "Courts in the Northern District of Illinois have held that plaintiffs cannot satisfy Rule 20's requirements by merely alleging that multiple defendants have infringed the same [IP rights]." *Art Ask Agency v. Individuals et al. on Schedule A*, No. 21-cv-06197, 2021 U.S. Dist. LEXIS 225823, at *4 (N.D. Ill. Nov. 23, 2021) (collecting cases and addressing misjoinder *sua sponte*).

Here, while the case is largely sealed, it seems that it involves many merchant defendants accused of infringing up to 16 different asserted copyrights. It is currently unclear how Plaintiff could support joinder under these circumstances. While misjoinder can result in all manner of substantive and practical prejudices to the defendants, one immediate one that the Firm has seen play out is the amount of bond. Currently the bond Plaintiff seeks across these actions is $10,000 total, which, split across all defendants ends up being only a few hundred dollars. But the harm to defendants due to a wrongful TRO will be exponentially more. Indeed, one of the Firm's clients had to shut down its business and lost hundreds of employees. A few hundred dollars will not cover this level of harm. Thus, the Court should consider *sua sponte* addressing the propriety of joinder and/or severing the cases to allow for a more just and equitable result.

**The Court should explore reasonable alternatives to an overly broad asset freeze**. If the Court is inclined to issue an asset freeze, there are reasonable and sensible alternative approaches that can avoid the otherwise irreparable harm to Temu merchants by way of an indiscriminate asset freeze, but still achieve the result Plaintiff ostensibly seeks.

9

In an infringement case like this, an asset freeze can only be used to freeze profits from the accused products (under the Court's equitable powers to order an accounting of profits) and cannot be used to freeze funds for any legal remedy, such as a claim for statutory damages. *See Deckers Outdoor Corp. v. P'ships et al. on Schedule A*, No. 13-cv-07621, 2013 WL 12314399, at *2 (N.D. Ill. Oct. 30, 2013) (citing *Grupo Mexicano de Desarrollo v. Alliance Bond Fund*, 527 U.S. 308, 331 (1999)); *Awareness Ave. Jewelry LLC v. P'ship et al. on Schedule A*, No. 8:23-cv-2, 2023 WL 3568387, *1 (M.D. Fla. May 19, 2023) (collecting cases); *Zorro Prods., Inc. v. Individuals et al. on Schedule A*, No. 23-cv-5761, 2023 WL 8807254, at *4 (N.D. Ill. Dec. 20, 2023).

To that end, the Court could achieve a more just result by first only granting Plaintiff's request for expedited discovery, *see* ECF No. 10 at 12 (requesting expedited discovery), which Plaintiff can then use to obtain the sales data from third party Temu, all while the case remains sealed and thus there is no risk of funds being moved. With that sales data in hand, Plaintiff can then return to the Court and seek an asset freeze that actually has some bearing on the amount at issue. Of course, the sales revenue without applicable cost deductions will still be overbroad for an "accounting of profits" asset freeze, but at least it will have some rational relationship to the amount at issue. To achieve an even more just result, the Court could also apply a reasonable profit margin estimate, but still sufficiently inflated to ensure the freeze covers more than the profits. For example, based on the Firm's experience, Temu merchants have generally ranged between 5% and 20% profit margins on the accused products at issue. Applying, for example, a 30% or 40% would likely cover substantially more than the ultimate calculation of profits for the accused products.

\* \* \*

The Firm looks forward to assisting the Court by answering any questions the Court may have on the issues raised in this brief. The Firm earnestly believes in the effectiveness and propriety

of due process litigation procedures developed over the more than two century history of the Republic. We urge the Court not to cast aside nearly all of them on the self-serving and speculative allegations of one private litigant filed under seal and without oppositional challenge.

Date: February 13, 2024　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　*/s/ William Flachsbart*
　　　　　　　　　　　　　　　　　　　　William Flachsbart
　　　　　　　　　　　　　　　　　　　　DUNLAP BENNETT & LUDWIG PLLC
　　　　　　　　　　　　　　　　　　　　333 N. Michigan Ave.; Suite 2700
　　　　　　　　　　　　　　　　　　　　Chicago, IL 60601
　　　　　　　　　　　　　　　　　　　　P: (312) 551-9500
　　　　　　　　　　　　　　　　　　　　F: (312) 551-9501
　　　　　　　　　　　　　　　　　　　　wflachsbart@dbllawyers.com